# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **SHERRY PLAINTIFF,** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | **No. 13 C 4825** |
| **v.** | **)** | |
| | **)** | **Magistrate Judge** |
| **CAROLYN W. COLVIN, Acting** | **)** | **Maria Valdez** |
| **Commissioner of Social Security,**[1] | **)** | |
| | **)** | |
| **Defendant.** | **)** | |
| | **)** | |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying Plaintiff Sherry Plaintiff's claims for Supplemental Security Income. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Plaintiff's motion for summary judgment is granted and the Commissioner's cross-motion for summary judgment [Doc. No. 22] is denied.

## BACKGROUND

### I.    PROCEDURAL HISTORY

On April 29, 2010, Plaintiff filed a claim for Supplemental Security Income, alleging disability since April 22, 2010. The claim was denied initially and upon reconsideration, after which she timely requested a hearing before an Administrative Law Judge ("ALJ"), which was held on January 25, 2012. Plaintiff

---

[1] Carolyn W. Colvin is substituted for her predecessor, Michael J. Astrue, pursuant to Federal Rule of Civil Procedure 25(d).

personally appeared and testified at the hearing and was represented by counsel. Vocational Expert ("VE") Jill Radke also testified.

On February 13, 2012, the ALJ denied Plaintiff's claim for Supplemental Security Income, finding her not disabled under the Social Security Act. The Social Security Administration Appeals Council then denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II.     FACTUAL BACKGROUND[2]

Plaintiff was born on October 26, 1964 and was 47 years old at the time of the ALJ hearing. She is a high school graduate who had last worked in 2001 due to marital and family problems.[3]

### A.     Medical Evidence

Plaintiff initially visited the emergency room at Mt. Sinai Hospital on April 3, 2010, and was diagnosed with lower back pain. She returned to the emergency room on April 6, when an MRI of her lower spine was performed, which showed L4-L5 central disk protrusion and a moderate degree of central canal narrowing at L5-S1, with impingement on the nerve root. Plaintiff attended some physical therapy sessions, but reported that her pain had increased and that the sessions had not helped; it was determined that therapy would not benefit Plaintiff unless "significant functional or pain change occurs." (R. 759.)

---

[2]  The following facts from the parties' briefs are undisputed unless otherwise noted.
[3]  Although Plaintiff alleged disability related to both physical and mental impairments, her appeal is limited to a specific discussion of her physical impairments.

Plaintiff's treating physician, Dr. Kenneth Bretts, completed an evaluation of her condition on June 1, 2010. Dr. Bretts had treated Plaintiff at six appointments over two months. In his report, Dr. Bretts diagnosed Plaintiff with diabetes, a herniated lumbar disk, and an ovarian mass. Bretts listed Plaintiff's chief complaints as "low back pain down leg." (R. 346.) With regard to Plaintiff's musculoskeletal system, Bretts noted that she attended physical therapy and might require future surgery. In the section for mental impairments covering observations, test results, treatment, and response to treatment, Dr. Bretts simply listed "unable to work." (R. 349.) Dr. Bretts also attached an assessment of Plaintiff's capacity for physical activity, in which he found that she had: a more than 50 percent reduced capacity for walking, bending, standing, stooping, sitting, turning, and climbing; a 20 to 50 percent reduced capacity for pushing and pulling; and an up to 20 percent reduced capacity for travel. (R. 349.) Dr. Bretts also stated that Plaintiff had the capacity to lift no more than ten pounds at a time during an eight-hour work day, five days per week. *Id.*

On June 14, 2010, state agency consultant Dr. Marion Panepinto completed a residual functional capacity analysis. Dr. Panepinto noted diagnoses of obesity, degenerative disk disease of the lumbar spine, a herniated lumbar disk, and diabetes, among other diagnoses. (R. 357.) In her assessment of the medical evidence, Panepinto noted a moderate degree of canal narrowing, but that a neurological consultation of April 2010 had indicated normal strength and non-surgical follow-up. (R. 357.) Dr. Panepinto concluded that Plaintiff could

occasionally lift twenty pounds, frequently lift ten pounds, could sit or stand for six hours in an eight-hour work day, and was unlimited in her ability to push or pull. (R. 351.)

Shortly afterward, on June 18, 2010, Plaintiff was seen by neurologist Dr. Roberta Glick. (R. 479.) Dr. Glick's report noted "strength is 5/5, equal bilaterally in all 4 extremities." *Id.* Glick also noted decreased sensation in Plaintiff's left leg, but that "the rest of the exam, touch and position [were] normal." *Id.* Dr. Glick's impression was low back pain, degenerative spine disease, and diabetes with "numbness of the legs." *Id.* Dr. Glick recommended referral to physical therapy and a pain clinic, and outpatient follow-up. *Id.*

In September 2010, Dr. Towfig Arjmand also rendered a residual functional capacity analysis and a summary of the medical findings that mirrored Dr. Panepinto's in its conclusions. (R. 515-21.)

In August, 2011, Plaintiff was again examined by Dr. Glick. (R. 661.) Dr. Glick reported strength of "5/5," and that Plaintiff's MRI showed "L4-5 disk and L5-S1 stenosis." *Id.* Dr. Glick recommended an additional MRI "since the previous one is old," and also recommended electromyography (EMG). *Id.* In October 2011, Plaintiff underwent the additional MRI, which was interpreted by Dr. Eduardo Nijensohn. (R. 671.) Dr. Nijensohn confirmed the degenerative disk disease and protrusions noted in the earlier MRI, and also confirmed that there was a "moderate degree of central foraminal narrowing." *Id.* Nijensohn also noted that, "when compared with the previous examination no gross changes are

demonstrated." *Id.* Finally, in December of 2011, the EMG was performed on Plaintiff. The physician reviewing the EMG noted a "positive S[traight ]L[eg ]R[aise] test on the left with weakness due to pain," (R. 721), and that the EMG showed chronic mild to moderate L5-S1 radiculopathy bilaterally. (R. 722.)

No medical expert testified at the hearing.

### C. <u>Plaintiff's Testimony</u>

Plaintiff testified that she had stopped working in 2001 because of family problems and because she had obtained custody of her daughter's children. (R. 44-45.) She began having back pain in April, 2010; she did not identify an injury corresponding to the onset, but instead stated that the pain "just came on." (R. 45.) She testified that she experienced pain in her back and her leg, which limited her ability to sit, stand, lift, and produced a need to lay down during the day.

Plaintiff testified that, during a typical day, she would awaken, wake the children, and help them prepare for school. Then she would "try to move around and do a little something around the house or whatever. And if I can't, I just sit there for a while." (R. 45.) Plaintiff stated that she was able to watch television and read, and that she would clean some areas of the house. However, she stated that if she spent too long on such tasks, "it'll start bothering me so I have to sit down . . . ." (R. 46.) It was hard for Plaintiff to prepare meals because it was difficult to stand for long periods of time. (R. 48.) Plaintiff spent about an hour per day performing her household tasks. (R. 51.) Her husband performed the heavy work around the house, and she stayed indoors most of the time. (R. 46.)

Plaintiff stated that she could sit continuously for about half an hour at a time; after that, her back would start bothering her and she would have to get up. (R. 48.) When this happened, Plaintiff stated that she would have to be moving for "about like 15 to 20 minutes" before returning to sitting. (R. 52.) She also stated that the pain would be reduced when she laid down. *Id.* Plaintiff stated that she could walk about two blocks before she would have to stop due to pain, and that she carried nothing heavier than five to ten pounds. *Id.*

### D.    <u>Vocational Expert Testimony</u>

The ALJ asked Vocational Expert ("VE") Jill Radke whether there were jobs that a hypothetical person with the same age, education, and work experience as Plaintiff, and a residual functional capacity ("RFC") limiting her to light exertional work with occasional climbing and frequent stooping, crouching, or crawling, could perform. (R. 55.) The ALJ also limited the individual's work to simple, repetitive work assignments without fast-paced production work. (R. 55-56.) The VE stated that there would be a total of 12,319 jobs available in northern Illinois which the individual could perform. (R. 56.) The ALJ then limited the hypothetical individual to being able to sit or stand at will, provided that the individual was not off-task for more than ten percent of the workday. *Id.* The VE testified that this would reduce the number of available jobs to 5,200. *Id.*

The ALJ then further limited the individual to lifting no more than ten pounds occasionally, and to standing or walking for no more than two hours in an eight-hour day. *Id.* The VE testified that there would be no jobs that such an

individual could perform. *Id.* The VE then clarified that, if the person was limited to lifting no more than ten pounds occasionally and sitting or standing at will—but was *not* limited to standing for only two hours per day—then approximately 2,900 jobs would be available. (R. 56-57.) On questioning from Plaintiff's attorney, the VE clarified that—if the person needed to stand, walk away from their workstation, and be away from the workstation 15 minutes every hour—there would be no jobs available. (R. 59.)

The ALJ then asked whether, if the individual were limited to the extent of Dr. Bretts's functional capacity analysis of Plaintiff, any jobs would be available for the hypothetical individual; the VE stated that there would not. (R. 57.)

### E.    ALJ Decision

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since her application date of May 5, 2010. (R. 17.) At step two, the ALJ concluded that Plaintiff had severe impairments of diabetes, obesity, lumbar degenerative disk disease, hypertension, history of anemia and peptic ulcer disease, borderline intellectual functioning, and adjustment disorder with anxiety and depression. (R. 17.) The ALJ concluded at step three that the impairments, alone or in combination, did not meet or medically equal a Listing, specifically examining Listings 1.04(A) and 12.02, 12.04, and 12.05. (R. 17-19.) The ALJ then determined that Plaintiff retained the RFC to perform light work, with certain restrictions. These restrictions included simple, repetitive work, and assignments without fast-

paced production. *Id.* Plaintiff was also "allowed a sit-stand option at will provided she is not off task more than 10% of the work period." *Id.*

At step four, the ALJ then concluded that Plaintiff had no past relevant work. (R. 23.) At step five, based upon the VE's testimony and Plaintiff's age, education, work experience and RFC, the ALJ concluded that Plaintiff could perform jobs existing in significant numbers in the national economy, leading to a finding that she was not disabled under the Social Security Act.

<u>**DISCUSSION**</u>

## I. ALJ LEGAL STANDARD

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 416.920(a)(4). An affirmative answer at either step three or step five leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step

three, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps one through four. *Id.* Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II. JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841; *see also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (holding that the ALJ's decision must be affirmed even if "'reasonable minds could differ'" so long as "the decision is adequately supported") (citation omitted).

In reaching a determination, an ALJ "must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ is not required to address "every piece of evidence or testimony in the record."

*Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). However, "the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014); *see Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) ("This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence.").

## III.  ANALYSIS

Plaintiff challenges the ALJ's decision in numerous ways, which reduce to three general claims: that the ALJ erred in assessing her credibility, in evaluating the medical evidence in the record, and in assessing her residual functional capacity. Because an additional medical opinion was necessary in this case, it must be remanded. And, although the other claims raised by Plaintiff would not themselves necessitate remand, they are addressed below in order to provide guidance on remand.

### A.  The ALJ's Failure To Consult A Medical Expert

Plaintiff argues that the ALJ erred in determining that her impairments, singly or in combination, did not meet or equal Listing 1.04(A). A step three finding requires an ALJ to determine whether a claimant's limitations meet or medically equal in severity a disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 416.920(a)(4)(iii). "Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue." *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004); *see also* 20 C.F.R. § 416.926(b). Listing 1.04(A), disorders of the spine, includes degenerative disk

disease, with which the ALJ found Plaintiff to be afflicted. (R. 17.) In order to meet the Listing, a claimant must show "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine))." 20 C.F.R. Part 404, Subpt. P, App. 1, § 1.04(A).

The ALJ concluded that Plaintiff's impairments did not equal the listing because "[n]o treating or examining physician has recorded findings equivalent in severity to the criteria" of Listing 1.04A and the record did not demonstrate such findings. (R. 18.) She also specified that Plaintiff did not meet the listing because there was "no evidence of nerve root impingement[ and] no evidence of weakness." (R. 18.) In reaching this finding, the ALJ based her opinion on the evaluations of state agency consultants Drs. Marion Panepinto and Towfig Arjmand, who rendered their opinions in June and September of 2010, respectively. (R. 357, 521) After the consultants' opinions were rendered, however, Plaintiff obtained additional medical testing and evaluation, including a magnetic resonance imaging scan (MRI) in March 2011 (R. 661) and electromyography (EMG) in December of 2011. (R. 721-22.)

Plaintiff argues that, because additional medical evidence was obtained after the medical sources had rendered their opinions, the ALJ was required to have a medical expert reevaluate this evidence before reaching a conclusion at step three. (Pl.'s Mem. at 13.) According to SSR 96-6p, an ALJ "must obtain an updated

medical opinion from a medical expert . . . [w]hen additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." 1996 WL 374180 at *4.[4]

In this case, Plaintiff is correct that the ALJ erred when he failed to consult a medical expert to address this additional evidence. Although EMG testing itself does not show that a claimant meets the criteria of Listing 1.04, it "may be useful in establishing the clinical diagnosis." 20 C.F.R. Part 404, Subpt. P, App. 1, § 1.00(C)(3); s*ee Reynolds v. Colvin*, No. 3:13CV1354, 2015 WL 333064, at *12 (N.D. Ind. Jan. 23, 2015). After reviewing the EMG performed in Decmeber 2011, Dr. Mihaela Hangan concluded that there was "electrophysical evidence of chronic mild to moderate L5-S1 radiculopathy bilaterally."[5] (R. 721-22.) Furthermore, the EMG also demonstrated "[c]hronic denervation changes" in multiple muscles. (R. 722.) And although an earlier examination found that Plaintiff exhibited no weakness, (R.661), Dr. Hangan in reviewing the EMG noted "positive SLR test on the left with weakness due to pain." (R. 721.)

In reaching their respective decisions, however neither of the state agency physicians noted a diagnosis of radiculopathy or any weakness. And, in explaining

---

[4] Interpretive rules, such as Social Security Rulings ("SSR"), do not have force of law but are binding on all components of the Agency. 20 C.F.R. § 402.35(b)(1); *accord Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).

[5] "Lumbar radiculopathy is a painful condition of the nerve roots in the lower spine, often caused by disc herniation or compression." *Schomas v. Colvin*, 732 F.3d 702, 704 (7th Cir. 2013).

her reasoning at step three, the ALJ noted that, "[s]pecifically, listing 1.04 is not met or[] equaled because there is no evidence of nerve root impingement[ and] no evidence of weakness . . . ." (R. 18, 20.) But the 2010 MRI had in fact noted "a moderate degree of central canal narrowing [and] L5-S1 central left paracentral disc protrusion impinging upon the left nerve root . . . ", (R. 256.), and the EMG provided additional evidence as to the possible effects of this impingement. Therefore, Dr. Glick's report on the EMG may have "change[d] the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." SSR 96-6p, 1996 WL 374180 at *4. The ALJ should have consulted a medical expert as to the effects of this evidence. *Cf. Carpenter v. Comm'r of Soc. Sec.*, 614 F. App'x 482, 488 (11th Cir. 2015) (holding no error in failing to order additional medical review where MRI showed no impingement and EMG stated "there was no evidence of active denervation"); *Archer v. Astrue*, No. 09 C 4705, 2011 WL 720193, at *13 (N.D. Ill. Feb. 22, 2011) (finding no error in failing to order additional medical review where EMG results revealed no "new finding[s]").

The omission of the 2011 MRI, by itself, would not have necessitated remand because it would not have changed the agency physicians' conclusions at step three. In their findings, both agency physicians Drs. Arjmand and Panepinto noted Plaintiff's earlier 2010 MRI and indicated that that scan noted L4-L5 central disk protrusion and moderate canal narrowing, as well as disk protrusion at L5-S1 impinging on the left nerve root. (R. 256.) However, these physicians determined

that, despite these findings, Plaintiff's impairments did not equal listing 1.04(A).

The 2011 MRI noted these same features and did not add significant additional

findings. (R. 671.) And the physician who interpreted both MRIs, Dr. Eduardo

Nijensohn, noted in regard to the 2011 MRI that, "when compared with the previous

examination no gross changes are demonstrated," *id.*, a finding which the ALJ

recognized in her decision. (R. 20.) Given that an additional medical opinion is

otherwise required in this case, however, the medical consultant should consider

this evidence as well.

**B.     The ALJ's Consideration of the Medical Opinions**

Plaintiff also argues that the ALJ erred in rejecting the opinion of her

treating physician, Dr. Kenneth Bretts, that she was unable to work. Initially, the

Court notes that Dr. Bretts made the notation that Plaintiff was "unable to work" in

the section of his evaluation related to Plaintiff's mental impairments. (R. 349) In

Plaintiff's appeal of the Commissioner's decision, however, she addresses only

issues related to her physical impairments. In this sense, then, this notation is not

relevant to the Court's determination of Plaintiff's appeal.

Nonetheless, even were Dr. Bretts to have made this assertion in relation to

Plaintiff's impairments as a whole, the ALJ still would not have erred in rejecting

that conclusion. An ALJ must give controlling weight to a treating physician's

opinion if the opinion is both "well-supported" and "not inconsistent with the other

substantial evidence" in the case record. 20 C.F.R. § 404.1527(c); *see Scott v. Astrue*,

647 F.3d 734, 739 (7th Cir. 2011). The ALJ must also "offer good reasons for

discounting" the opinion of a treating physician, *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (internal quotations omitted), and—even if the opinion is not given controlling weight—an ALJ must still determine what value the assessment does merit according to the factors listed in 20 C.F.R. § 416.927. *See Scott*, 647 F.3d at 740; *Campbell*, 627 F.3d at 308. Rather than a medical opinion, however, an opinion that a claimant is disabled or unable to work is a determination reserved to the Commissioner. *See* 20 C.F.R. § 416.927(d)(1). In this case, the ALJ simply rejected Dr. Bretts's conclusory statement that Plaintiff was "unable to work," (R. 23, 349), and "a claimant is not entitled to disability benefits simply because her physician states that she is 'disabled' or unable to work. The Commissioner, not a doctor selected by a patient to treat her, decides whether a claimant is disabled." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) (citations omitted). The ALJ did not err when he refused to simply credit Dr. Bretts's assertion that Plaintiff was unable to work.

Plaintiff also argues that the ALJ erred by rejecting Dr. Bretts's conclusion that Plaintiff had a fifty percent reduction in the ability to walk, bend, stoop, stand, sit, turn, and climb, which the VE testified would have precluded her from any employment. (R. 57.) Citing to *Gudgel v. Barnhart*, 345 F.3d 467 (7th Cir. 2003), Plaintiff argues that the ALJ "cannot rely on the opinion of a non-examining reviewer in order to reject the opinion of the treating physician," (Pl.'s Mem.at 12) and claims that the ALJ erred in crediting the opinions of Drs. Panepinto and Arjmand over that of Dr. Bretts in this respect.

Plaintiff's reliance on *Gudgel*, however, goes too far. In *Gudgel*, the Seventh Circuit specified that "[a]n ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." 345 F.3d at 470. In that case, while an examining physician had made a diagnosis of post-polio syndrome and the ALJ relied on a non-examining physician's testimony to find against such a diagnosis, the non-examining physician "failed to identify any inconsistency between the post-polio diagnosis and the medical record, except for [an] unsupported opinion" about muscle atrophy. *Id.* Here, in contrast, the state agency physicians' opinions both provided descriptions of the medical evidence supporting their conclusions, including analyses of the MRI findings and summaries of Plaintiff's treatment records. (R. 357, 515.) In *Gudgel*, the Court also found important that "[t]he ALJ did not explain how the evidence in the record contradict[ed the examining doctor's] diagnosis of post-polio syndrome." *Id.* at 470. In Plaintiff's case, in contrast, the ALJ discussed various findings in the medical evidence to support her conclusion, including treatment notes indicating that Plaintiff had full strength in her back, limited findings regarding tenderness and decreased sensation in her back, as well as the MRI findings, in addition to Plaintiff's testimony. (R. 20.) Although these conclusions will likely be affected by the new medical opinion required on remand, the ALJ did not err on the record before her in this respect.[6]

---

[6] As other courts have pointed out, the rule from *Gudgel* could be read merely as a restatement of the treating physician rule: "[i]f the non-examining physician's opinion

Curiously, however, the ALJ also discounted Dr. Bretts's opinion in part because that it did not contain a "function-by-function analysis provided of the noted limitations." (R. 23.) Dr. Bretts's evaluation, however, did include such a function-by-function analysis as described above. (R. 349.) And, even had it not, "the regulations do not require a treating physician to provide a function-by-function analysis in order to procure the ALJ's deference." *Pagos v. Colvin*, No. 13 CV 4430, 2015 WL 1502923, at *5 (N.D. Ill. Mar. 27, 2015)). Nonetheless, as the ALJ correctly discussed the medical opinions in failing to give Dr. Bretts's opinion controlling effect on this point as discussed above, any error here would be harmless.

Relatedly, Plaintiff also argues that the ALJ's reliance on the agency physicians' opinions in general was misplaced because, despite the fact that her treating physician Dr. Bretts had rendered the opinion as discussed above, the agency physicians' opinions stated that there was no opinion from a treating physician in Plaintiff's file. Plaintiff is correct that both Dr. Panepinto (R. 356) and Dr. Arjmand (R. 521) made this error. This raises concerns that the doctors' evaluations were not based on the full medical evidence in the file, which should have affected the weight that the ALJ gave them in her analysis. See 20 C.F.R. § 416.927(e)(2)(ii). On remand, the ALJ should account for this defect in rendering her decision.

---

stands alone, it is not supported by other medical evidence in the record. If it is consistent with other medical evidence in the record, then there is evidence in the record beyond the non-examining physician's opinion that is contrary to the treating physician's opinion, thereby undermining the treating physician's assessment." *Henriksen v. Astrue*, No. 07 C 6142, 2008 WL 4155175, at *8 (N.D. Ill. Sept. 9, 2008); *see Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008).

## C.     The ALJ's Evaluation of Plaintiff's Credibility

Plaintiff also challenges the ALJ's assessment of her credibility.[7] As discussed below, the ALJ did not commit reversible error in his credibility assessment based on the record before her at the time of her opinion. However, because of the necessity for a new medical opinion in this case, the ALJ will need to redetermine Plaintiff's credibility in light of that opinion on remand. *See* SSR 96-7p, 1996 WL 374186, at *4 ("Based on a consideration of *all of the evidence in the case record*, the adjudicator may find all, only some, or none of an individual's allegations to be credible.") (emphasis added). Accordingly, the ALJ's credibility determination is discussed below in order to provide guidance in that process.

Plaintiff argues that reversal is appropriate because the ALJ used "boilerplate" language similar to that criticized by the Seventh Circuit in other cases. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014); *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). The Seventh Circuit has specified that language

---

[7] In Plaintiff's opening brief, she argues that "[t]he ALJ's opinion regarding Ms. Adams's pain, functional capacity, and credibility was improper . . . [because a] medical expert should have assessed the evidence and testimony of record, particularly since no medical expert reviewed the evidence of record after September, 2010." (Pl.'s Mem. at 14.) In this assertion, Plaintiff she seems to argue that SSR 96-6p's requirement that an ALJ obtain a supplementary medical opinion applies not only at step three of the analysis, but also when an ALJ assess a claimant's credibility and determines the claimant's RFC. This conclusion is contradicted by the terms of SSR, which apply the requirement when the ALJ determines "Medical Equivalence to an Impairment in the Listing of Impairments." 1996 WL 374180 at *3-4. This interpretation also conflicts with the Administration's regulations, which state that the evaluator is required to examine the medical evidence in evaluating symptoms, including pain, in determining a claimant's disability. 20 C.F.R. § 416.929(a); *see* SSR 96-7p, 1996 WL 374186 at *1; *see also Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) ("We do not see any reason to impose such a requirement [for obtaining an additional medical opinion] in this case, particularly considering that the determination of a claimant's RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide.").

similar to that used by the ALJ "is not only boilerplate; it is meaningless boilerplate," and that it "yields no clue to what weight the trier of fact gave the testimony." *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010). But "[t]he use of boilerplate is innocuous when, as here, the language is followed by an explanation for rejecting the claimant's testimony." *Schomas*, 732 F.3d at 708.

Plaintiff next argues that the ALJ erred when he found that her "lack of more aggressive treatment, surgical intervention, or even a referral to a specialist suggests that [her] symptoms and limitations were not as severe as alleged." (Pl.'s Mem. at 9; R. 20.) However, a "lack of aggressive treatment for pain despite complains of disabling pain" is "an entirely valid basis for finding a claimant's testimony not credible." *Applewhite v. Colvin*, 54 F. Supp. 3d 945, 955 (N.D. Ill. 2014) (summarizing cases); *see also* SSR 96-7p 1996 WL 374186 at *7 ("[T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints . . . ."). Plaintiff does not argue in general with the ALJ's summary of the treatment that she received, where the ALJ noted that Plaintiff attended a few physical therapy sessions and was recommended to lose weight. (R. 21.) Instead, Plaintiff argues that the ALJ was incorrect to determine that this course of treatment was "conservative." Plaintiff, however, provides no citation to any authority for her position, and the treatment undertaken in this case is well within the range of treatment deemed conservative by the Seventh Circuit in past cases. *See, e.g.*, *Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (affirming adverse credibility finding based on "relatively conservative"

treatment consisting of "various pain medications, several injections, and one physical therapy session"); *cf. Olsen v. Colvin*, 551 F. App'x 868, 875 (7th Cir. 2014) ("More significantly, the epidural steroid injections were the most invasive treatment [the claimant] received for her back pain, and those injections have been characterized as 'conservative treatment.' ") (citing *Singh v. Apfel*, 222 F.3d 448, 450 (8th Cir.2000)). The ALJ did not err in finding that Plaintiff's course of treatment was conservative and in finding that this course of treatment adversely affected her credibility.

Relatedly, however, the ALJ did err when, in determining that Plaintiff had received only conservative treatment, she found that Plaintiff had not been referred to a specialist. (R. 20) Plaintiff, in fact, had been referred to a specialist—Dr. Roberta Glick, a neurosurgeon—who evaluated her test results and ordered additional imaging. (R. 719.) This error, by itself, would not necessitate remand, because an ALJ's credibility determination need not be flawless, *see Simila*, 573 F.3d at 517; *Halsell v. Astrue*, 357 F. App'x 717, 722 (7th Cir. 2009), and the ALJ did correctly consider Plaintiff's treatment in other respects, as described above. And—although not recognizing Dr. Glick as a specialist explicitly—the ALJ did discuss Dr. Glick's report and the results of her testing in reaching her decision. Nonetheless, given that an additional medical expert opinion is needed in this case, this misconception can be corrected on remand.

Plaintiff also criticizes the ALJ's reliance on Plaintiff's ability to complete activities of daily living in finding her testimony not credible. In doing so, the ALJ

noted that—while Plaintiff's daily activities were limited—there was no evidence that that limitation arose from disability rather than choice. (R. 21.) The ALJ also noted that Plaintiff was able to "read, watch television, take public transportation, and watch her grandchildren," which the ALJ found "incongruent with disabling pain." (R.21.) It is true that the Seventh Circuit has "remarked the naïveté of the Social Security Administration's administrative law judges in equating household chores to employment," *Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013), and stated that "[t]he failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir.2012). The Seventh Circuit has also cautioned that evidence of daily activities at a level arguably similar to Plaintiff's is not alone is not enough to show an ability to work. *See Scrogham*, 765 F.3d at 700-01; *see also Roddy v. Astrue*, 705 F.3d 631 (7th Cir. 2013). However, in a situation where the ALJ does not place undue weight on the activities of daily living and specifies "several valid reasons for finding [a claimant] not credible," there is no error. *See Schreiber v. Colvin*, 519 F. App'x 951, 961 (7th Cir. 2013).

Here, Plaintiff's daily activities were limited: her uncontradicted testimony was that, while she could perform limited household tasks, she could do so only for a total of one hour per day. (R. 51.) This seems hardly consistent with the ability to perform full-time work. However, the ALJ's credibility determination rested not only on Plaintiff's ability to perform household tasks, but on the conservative course

of treatment as described above, as well as contradictions between Plaintiff's statements at the hearing as to her abilities and her earlier statements and treating physicians' notes, (R. 21.) which are also supported by the record. (R. 523, 719, 726.) In this situation, the ALJ's credibility determination was not "patently wrong" on the record presented. *See Olsen*, 551 F. App'x at 876 (holding ALJ "correctly compared [claimant's] daily activities (which included cooking, reading, shopping for groceries, watching television, and vacuuming) to her testimony that she has a very limited ability to sit, stand, and walk and concluded that [claimant] was not credible as to the intensity and persistence of her symptoms"). However, given the additional medical opinion to be obtained, this conclusion may change on remand.

Plaintiff also argues that the ALJ erred in her credibility determination by misstating evidence in the record. She argues first that the ALJ incorrectly found Plaintiff not credible because there was no evidence of nerve root impingement to support her pain when, in fact, there was such evidence in the record. (P.'s Mem. at 10.) Plaintiff's argument, however, misreads the ALJ's decision. The ALJ stated not that no nerve root impingement existed, but rather that "[a]n October 2011 magnetic resonance imagining scan (MRI) showed moderate narrowing, but *unchanged* nerve root impingement." (R. 20, 720) (emphasis added.) The ALJ then referenced medical records from Plaintiff's 2011 MRI, which stated that—when compared with her previous examinations—Plaintiff demonstrated "no gross changes." (R. 671.) After this summary, the ALJ summarized that: "There is no evidence of any nerve root impingement *to cause the pain and restrictions alleged*."

(R. 20) (emphasis added.) A fair reading of the ALJ's statement in context suggests not that the ALJ found no impingement to exist, but that the impingement was not so significant as to support the level of pain claimed by Plaintiff, a proper consideration in evaluating credibility. *See* 20 C.F.R. § 416.929(c)(2). Of course, given that the new medical opinion in this case will directly address this issue, the ALJ's evaluation will on this issue will also likely change on remand.

Finally, Plaintiff argues that the ALJ erred by finding that the medical evidence did not support Plaintiff's testimony that her pain worsened in April 2010. Plaintiff argues that because she "[w]as seen at the emergency room twice, had an MRI, was seen by a neurosurgeon, and began physical therapy, all in April 2010, the medical evidence does support Ms. Plaintiff's testimony." (Pl.'s Mem. at 10.) These assertions, while true, do not refer to medical evidence evaluated by the ALJ. Instead, Plaintiff here asks the Court to reweigh the evidence considered by the ALJ as to her credibility, which this Court may not do. *See Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (stating that, in social security appeals, reviewing courts "are not allowed to displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations.").

### C.  The ALJ's Residual Functional Capacity Determination

Plaintiff also argues that the ALJ erred in assessing her RFC by failing to fully address her testimony as to her need to stand up and lie down during the day. (Pl.'s Mem. at 10.) An RFC is the most that a claimant can do despite her limitations, the determination of which is "used to determine [a claimant's] ability to engage in various levels of work (sedentary, light, medium, heavy, or very

heavy.).” *Clifford*, 227 F.3d at 872 n.7; s*ee* 20 C.F.R. § 404.1545(a)(1). “In determining an individual’s RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling.” *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009); *see* SSR 96-8p, 1996 WL 374184, at *7.

Plaintiff is correct that the ALJ erred because, while she found Plaintiff’s RFC limited to sitting for 30 minutes at a time, she failed to address Plaintiff’s testimony that she was required to stand and move for 15 to 20 minutes after sitting for 30 minutes. At the administrative hearing, Plaintiff testified that she was only able to sit for half an hour at a time, after which she would need to “get up and move around.” (R. 48.) She later specified that, after sitting for 30 minutes, she would have to “move around” for “about like 15 to 20 minutes” prior to sitting back down again. (R. 52.) The vocational expert then testified that an individual who not only had to get up every thirty minutes but who also had to walk around for 15 minutes one time per hour would not be capable of sustaining full-time employment. (R. 58-59.) In rendering her decision, the ALJ limited Plaintiff’s RFC to thirty minutes of continuous sitting, after which Plaintiff would be able to stand at will. (R. 19.) However, the ALJ did not address Plaintiff’s testimony that she needed to walk for 15 or 20 minutes after sitting.

The ALJ’s failure to address this alleged limitation was error. In determining a claimant’s RFC, an ALJ has a duty to “evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not

dismiss a line of evidence contrary to the ruling." *Villano*, 556 F.3d at 563.

"[A]lthough an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore*, 743 F.3d at 1123. As Plaintiff's testimony was the only specific evidence on related to her need to move around for 15 to 20 minutes after sitting, and the ALJ overlooked a "line of evidence" by failing to consider that testimony and then by failing to determine whether or not such a limitation was part of Plaintiff's RFC. This leaves the court unable to fully evaluate the ALJ's analysis: without being sure the ALJ considered and dismissed this claim, it cannot determine whether the ALJ adequately accounted for all of Plaintiff's limitations in reaching her conclusion, and therefore cannot determine whether his reliance on the VE's testimony was sound. *See Phillips v. Astrue*, 601 F. Supp. 2d 1020, 1034 (N.D. Ill. 2009) (remanding where impossible to determine sufficiency of hypothetical question because "the ALJ never adequately resolved the core factual issue of, inter alia, whether Claimant needed to lie down for one hour per day."). The ALJ's failure to discuss Plaintiff's alleged limitation on this point prevents the Court from fully reviewing her findings.

The Commissioner argues that—because agency medical experts Drs. Marion and Arjmand's opinions *did not* find a sit-stand requirement to apply—any error was harmless as the "ALJ could have relied on the reviewing physicians' opinions and not included any accommodation." (Def.'s Mem. at 9). While this may be true, the ALJ did not put forward that argument, and an agency's lawyers cannot "defend

the agency's decision on grounds that the agency itself had not embraced." *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (discussing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943)); *see also Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) ("[T]hese are not reasons that appear in the ALJ's opinion, and thus they cannot be used here."). On remand, the ALJ should clarify the extent to which she finds Plaintiff to require movement after sitting for 30 minutes, and the effect of any limitation found on the ALJ's ultimate findings.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED and the Commissioner's cross-motion for summary judgment [Doc. No. 22] is DENIED. The Court finds that this matter should be remanded to the Commissioner for further proceedings consistent with this Order.

**SO ORDERED.**                                    **ENTERED:**

**DATE:    January 26, 2015**                    _____
                                                  **HON. MARIA VALDEZ**
                                                  **United States Magistrate Judge**

26